**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**                05 CV. 6617 (PKC) (MHD)
-----------------------------------------------------------------X
**LUIS URIBE,**                                                  ECF CASE

                               Plaintiff,

                                                                 <u>**COMPLAINT**</u>
          -against-
                                                                 **Jury Trial Demanded**
**ELSEVIER SCIENCE,**

                               Defendant.
-----------------------------------------------------------------X

       Plaintiff, **LUIS URIBE**, by his attorneys, the Law Offices of Lee Nuwesra,

complaining of Defendant, **ELSEVIER SCIENCE**, as for his complaint respectfully

alleges as follow:

<u>**NATURE OF THE ACTION**</u>

       1.      This is an action for discrimination based on Race/Ethnicity and Retaliation in

the terms, conditions, and privileges of employment, as protected under § 1981 of the

Civil Rights Act of 1866, 42 U.S.C. § 1981 (1982) ("Section 1981").  Moreover, Plaintiff

brings claims for Race, National Origin, Age discrimination and Retaliation as protected

under the New York State Human Rights Law, Executive Law §§ 290 <u>et seq</u>. (the

"Human Rights Law"), and by the New York City Human Rights Law, Administrative

Code §§ 8-101 <u>et seq.</u> (the "Code").

       2.      Plaintiff also seeks costs and attorneys fees authorized by 42 U.S.C. § 1981,

New York City Administrative Code § 8-101, <u>et seq</u>., and other relevant statutes.

## JURISDICTION AND VENUE

3.     The jurisdiction of the Court over this controversy as to enforcement of the provisions of 42 U.S.C. § 1981 is based upon 28 U.S.C. § 1331.

4.     Supplemental jurisdiction of the Court over the State and Local claims brought under the New York Human Rights Law, and the Code, is based on 28 U.S.C. § 1367(a).

5.     The unlawful employment practices alleged below were committed within this District.  Accordingly, venue lies within the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

6.     At all times hereinafter mentioned, Plaintiff, Luis Uribe ("Plaintiff" or "Uribe") was and still is a resident of Kings County, City and State of New York.

7.     Upon information and belief, at all times hereinafter mentioned, Defendant Elsevier Science ("Defendant" or "Elsevier"), was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York with its principal place of business, located at 360 Park Avenue, New York, NY 10010.

8.     Defendant Elsevier, at all times hereinafter mentioned employs more than four (4) persons and is an employer within the meaning of the New York State Human Rights Law, § 292.5, Executive law § 290. et seq. (hereinafter the "Human Rights law").

9.     Defendant Elsevier, at all times hereinafter mentioned employs more than four (4) persons and is an employer within the meaning of New York City Human Rights Law, 8-102.5 Administrative Code §§ 8-101 et seq.

10.   Defendant Elsevier, was under a duty to abide by §1981 of the Civil Rights Act

of 1866, 42 U.S.C. § 1981 (1982) ("Section 1981").  Moreover, Defendant Elsevier was under a duty to abide by the New York State Executive Law, Section 296 et seq., the New York City Administrative Code, Section 8-101 et seq., and the case law arising therefrom, which prohibit discrimination in employment, on the basis of Race, Ethnicity, and/or National Origin, as well as Age.

11.    Defendant Elsevier breached its duty under the above-referenced statutes and case law arising therefrom, by discriminating against Plaintiff in his employment on the basis of his Race, Ethnicity, National Origin and/or Age.

## **THE FACTS**

12.    Plaintiff Luis Uribe, was born in Colombia, South America, in 1944.

13.    Plaintiff was initially hired by Matthew Bender, a Law Publishing Company, as Entry Level Support Technician, in November 1995.

14.    Upon information and belief, Matthew Bender, which is located in New York, was a subdivision of and under the Times Mirror Umbrella, a Magazine Publishing Company.

15.    In 1996, Plaintiff was recognized as one of the best Infrastructure Technology Employees and awarded $7,500 in recognition thereof.

16.    In 1997, Plaintiff was again awarded and received a bonus of $15,000 for his exemplary work.

17.    Upon information and belief, some time in the middle of 1997, Times Mirror acquired Mosby, a Medical Publishing Company with its Headquarters located in St. Louis, Missouri.  At this time, Times Mirror had both Matthew Bender and Mosby under its umbrella.

18.    Mosby had an office site in Philadelphia, and Plaintiff was asked to analyze the systems that were utilized in the Philadelphia Office. That Office employed about 100 employees.

19.    The Philadelphia Office had three servers, a Novell 3.11 running printing and file sharing, a Novell 3.12 server running the e-mail system and a Windows NT 4.0 functioning as a router.  These servers were reporting a variety of problems where the servers were down and operations were being interrupted.

20.    One of the main reasons for these problems was that Windows and all the applications were running off the servers, and the e-mail system was poorly managed.  In effect, this caused users to have no email for days, at times.

21.    After a thorough analysis of the Philadelphia Office's technological problems, Plaintiff concluded that the only way he could fix the problems was to upgrade all the desktops to Windows 95 and to have all the applications run off the local hard drive.

22.    Upon information and belief, in 1998, Mosby was sold to Harcourt, a Publishing Company of Children's Books, and Matthew Bender was sold to Elsevier, a Science Publishing Company.

23.    Upon information and belief, as a result of Harcourt's acquisition of Mosby, the majority of Mosby's employees were laid off, but Plaintiff was invited to remain with the company.

24.    Amongst other duties, Plaintiff maintained computers for the Mosby employees that remained. Plaintiff did this for almost one year.

25.     Plaintiff also helped Bradley Mitchell, the Infrastructure Technology Manager of WB Saunders, acquaint himself with the Company's Systems during the merger transition.

26.     Upon information and belief, Harcourt owned WB Saunders, a Publishing Company, which was also in Philadelphia.

27.     Upon information and belief, as a result of Hartcourt's purchase of Mosby, Mosby was absorbed by WB Saunders.

28.     After a few months, WB Saunders moved one of their Departments, namely, the Clinics Department to the Mosby building.

29.     Bradley Mitchell realized Plaintiff's dedication and skills and asked him to join his Infrastructure Technology Group. Mr. Mitchell increased Plaintiff's salary by 16% after he had sent Plaintiff to Lotus Notes Training.

30.     Plaintiff also completed a Microsoft Certified Systems Engineer in Microsoft Windows NT 4.0 Program, and was promoted to a Senior Support Analyst position.

31.     Under Mr. Mitchell's management, Plaintiff became the Lotus Notes Administrator, the main back up of the Philadelphia Infrastructure Technology Department and the Server Administrator.

32.     Sometime in May 2001, Harcourt was sold to Elsevier Science. Moreover, Plaintiff helped in this transition as well. Plaintiff took part in the migration of the St. Louis office and also helped the Elsevier team from England migrate all the servers and all their applications into the Elsevier Science domain "ELSCIENCE."

33.     Before Elsevier purchased Hartcourt, Plaintiff was the maintainer of this site. Plaintiff stayed long hours to keep up with the daily operations.

34.    Throughout his tenure with Defendant Elsevier, as well as the other aforementioned Publishing Companies, Mr. Uribe's work performance time and attendance were exemplary.

35.    Michael Stech, a White Male who is in his early 30's, replaced Bradley Mitchell, and Plaintiff helped Mr. Stech settle into his position.

36.    Subsequently, Mr. Stech hired Michael Fenton, a 23 year old White Male, as a Technician, and Plaintiff was instructed to train Mr. Fenton.  Soon after, Mr. Fenton was given all of Plaintiff's duties.

37.    In early 2002, Mr. Daniel Lieberman, a White Male also in his early 30's, became Plaintiff's Supervisor.

38.    Soon thereafter, Mr. Lieberman started to diminish Plaintiff's roles in the Infrastructure Technology Department. Mr. Lieberman continuously insisted that Plaintiff teach other younger non South American Infrastructure Technology members everything he knew; i.e., backups, maintenance of the servers, and the e-mail system which consisted of Lotus Notes.

39.    However, when Plaintiff asked Mr. Lieberman to learn other aspects of the developing technology, Mr. Lieberman replied that Plaintiff did not need to.

40.    The cross training at Plaintiff's department favored the White and significantly Younger employees, to the detriment of Mr. Uribe.

41.    In March 2002, Defendant offered Plaintiff to transfer to Hoboken, New Jersey.

42.    Plaintiff declined the transfer and opted to stay at his current location, in Philadelphia.  However, Defendant eventually replaced Plaintiff with a White Younger employee, namely Mr. Howard Longstrech.

43.    Consequently, Defendant denied Plaintiff's request to remain at the Philadelphia site, for which Mr. Uribe was especially qualified for, because they had hired Mr. Longstrech to fill Plaintiff's position.

44.    In or about September 2002, Defendant forced him to transfer to Hoboken, New Jersey, against his will, where Plaintiff worked for about a year.

45.    Upon information and belief, someone was fired from the New York site and Plaintiff was involuntarily transferred again to New York, as his replacement.

46.    Plaintiff was forced to work at the New York site under the management of Annie Oddo, a White female, who is significantly younger than Plaintiff.  Defendant's action was designed to force Plaintiff's resignation.

47.    While in New York, Plaintiff was essentially demoted, and subjected to entry level duties as opposed to the duties a person of his qualifications should have.  He was also supervised by younger and less qualified workers.

48.    In New York, although Plaintiff was to be utilized as a Senior Technical Analyst, instead, he was made to perform menial and trivial tasks.  For example, he moved boxes, stripped hard drives and performed other similar entry level and demeaning work.

49.    Plaintiff complained to Ms. Oddo about his underutilization, and the fact that he witnessed other younger non South American employees performing the duties he was lined up to do .

50.    Plaintiff's complaints were ignored.  When Plaintiff complained to Mr. Rick Komyanek about what he perceived to be discriminatory and preferential treatment

towards, younger or non South Americans, he was told that Mr. Komyanek will always support his managers regardless of how Plaintiff felt.

51.    After Plaintiff complained of discrimination, he received an unjustified performance review, and within a short period thereafter he was terminated.

52.    Plaintiff was terminated on January 14, 2005.

53.    Plaintiff, believes that Defendant Elsevier violated his rights under §1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1982) ("Section 1981"), when it discriminated against him on account of his Race/Ethnicity, by having Plaintiff train the less experienced non-Colombian candidates, and favoring the same.  Moreover, his rights were violated under the New York State Human Rights Law, Executive Law §§ 290 et esq. ("HRL"); and the New York City Human Rights Law, Administration Code §§ 8-101 et seq. ("Code"), when it discriminated against him on account of his Race, National Origin, and Age, by having Plaintiff train the significantly younger, less experienced non-Colombian candidates, and subsequently firing him when the training was completed.

**DAMAGES**

54.    As a direct and proximate consequence of Defendant's intentional violations and unlawful discriminatory employment policies and/or practices, as heretofore and hereafter described, Plaintiff has and continues to suffer loss of income, including past and future salary increases, and other non-pecuniary losses. Moreover, Plaintiff suffers injury to his professional standing, and had to incur expenses, including legal fees and costs.

### AS AND FOR A FIRST CAUSE OF ACTION: 42 U.S.C. § 1981
### (Race/Ethnicity Discrimination and Retaliation By Defendant Elsevier)

55.   Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 54 of this Complaint with the same force and effect as if each were fully set forth herein.

56.   Plaintiff was born in Colombia, is of Colombian descent, and as such is a member of a protected class under 42 U.S.C § 1981.

57.   Plaintiff was initially hired by Matthew Bender, a Law Publishing Company, as Entry Level Support Technician, in November 1995.

58.   Upon information and belief, Matthew Bender, which is located in New York, was a subdivision of and under the Times Mirror Umbrella, a Magazine Publishing Company.

59.   In 1996, Plaintiff was recognized as one of the best Infrastructure Technology Employees and awarded $7,500 in recognition thereof.

60.   In 1997, Plaintiff was again awarded and received a bonus of $15,000 for his exemplary work.

61.   Upon information and belief, some time in the middle of 1997, Times Mirror acquired Mosby, a Medical Publishing Company with its Headquarters located in St. Louis, Missouri.  At this time, Times Mirror had both Matthew Bender and Mosby under its umbrella.

62.   Mosby had an office site in Philadelphia, and Plaintiff was asked to analyze the systems that were utilized in the Philadelphia Office. That Office employed about 100 employees.

63.    The Philadelphia Office had three servers, a Novell 3.11 running printing and file sharing, a Novell 3.12 server running the e-mail system and a Windows NT 4.0 functioning as a router.  These servers were reporting a variety of problems where the servers were down and operations were being interrupted.

64.    One of the main reasons for these problems was that Windows and all the applications were running off the servers, and the e-mail system was poorly managed.  In effect, this caused users to have no email for days, at times.

65.    After a thorough analysis of the Philadelphia Office's technological problems, Plaintiff concluded that the only way he could fix the problems was to upgrade all the desktops to Windows 95 and to have all the applications run off the local hard drive.

66.    Upon information and belief, in 1998, Mosby was sold to Harcourt, a Publishing Company of Children's Books, and Matthew Bender was sold to Elsevier, a Science Publishing Company.

67.    Upon information and belief, as a result of Harcourt's acquisition of Mosby, the majority of Mosby's employees were laid off, but Plaintiff was invited to remain with the company.

68.    Amongst other duties, Plaintiff maintained computers for the Mosby employees that remained. Plaintiff did this for almost one year.

69.    Plaintiff also helped Bradley Mitchell, the Infrastructure Technology Manager of WB Saunders, acquaint himself with the Company's Systems during the merger transition.

70.    Upon information and belief, Harcourt owned WB Saunders, a Publishing Company, which was also in Philadelphia.

71.     Upon information and belief, as a result of Hartcourt's purchase of Mosby, Mosby was absorbed by WB Saunders.

72.     After a few months, WB Saunders moved one of their Departments, namely, the Clinics Department to the Mosby building.

73.     Bradley Mitchell realized Plaintiff's dedication and skills and asked him to join his Infrastructure Technology Group. Mr. Mitchell increased Plaintiff's salary by 16% after he had sent Plaintiff to Lotus Notes Training.  Plaintiff also completed a Microsoft Certified Systems Engineer in Microsoft Windows NT 4.0 Program.

74.     Under Mr. Mitchell's management, Plaintiff became the Lotus Notes Administrator, the main back up of the Philadelphia Infrastructure Technology Department and the Server Administrator.

75.     Sometime in May 2001, Harcourt was sold to Elsevier Science. Moreover, Plaintiff helped in this transition as well. Plaintiff took part in the migration of the St. Louis office and also helped the Elsevier team from England migrate all the servers and all their applications into the Elsevier Science domain "ELSCIENCE."

76.     Before Elsevier purchased Hartcourt, Plaintiff was the maintainer of this site. Plaintiff stayed long hours to keep up with the daily operations.

77.     Throughout his tenure with Defendant Elsevier, as well as the other aforementioned Publishing Companies, Mr. Uribe's work performance time and attendance were exemplary.

78.     Michael Stech, a White Male, replaced Bradley Mitchell, and Plaintiff helped Mr. Stech settle into his position.

79.     Subsequently, Mr. Stech hired Michael Fenton, a White Male, as a Technician, and Plaintiff was instructed to train Mr. Fenton.  Soon after, Mr. Fenton was given all of Plaintiff's duties.

80.     In early 2002, Mr. Daniel Lieberman, a White Male also in his early 30's, became Plaintiff's Supervisor.

81.     Soon thereafter, Mr. Lieberman started to diminish Plaintiff's roles in the Infrastructure Technology Department. Mr. Lieberman continuously insisted that Plaintiff teach other non South American Infrastructure Technology members everything he knew; i.e., backups, maintenance of the servers, and the e-mail system which consisted of Lotus Notes.

82.     However, when Plaintiff asked Mr. Lieberman to learn other aspects of the developing technology, Mr. Lieberman replied that Plaintiff did not need to.

83.     The cross training at Plaintiff's department favored the White employees, to the detriment of Mr. Uribe.

84.     In March 2002, Defendant offered Plaintiff to transfer to Hoboken, New Jersey.

85.     Plaintiff declined the transfer and opted to stay at his current location, in Philadelphia.  However, Defendant eventually replaced Plaintiff with a White employee, namely Mr. Howard Longstrech.

86.     Consequently, Defendant denied Plaintiff's request to remain at the Philadelphia site, for which Mr. Uribe was especially qualified for, because they had hired Mr. Longstrech to fill Plaintiff's position.

87.     In or about September 2002, Defendant forced him to transfer to Hoboken, New Jersey, against his will, where Plaintiff worked for about a year.

88.   Upon information and belief, someone was fired from the New York site and Plaintiff was involuntarily transferred again to New York, as his replacement.

89.   Plaintiff was forced to work at the New York site under the management of Annie Oddo, a White female.   Defendant's action was designed to force Plaintiff's resignation.

90.   While in New York, Plaintiff was essentially demoted, and subjected to entry level duties as opposed to the duties a person of his qualifications should have.   He was also supervised by less qualified workers.

91.   In New York, although Plaintiff was to be utilized as a Senior Technical Analyst, instead, he was made to perform menial and trivial tasks.   For example, he moved boxes, stripped hard drives and performed other similar entry level and demeaning work.

92.   Plaintiff complained to Ms. Oddo about his underutilization, and the fact that he witnessed other non South American employees performing the duties he was lined up to do .

93.   Plaintiff's complaints were ignored.   When Plaintiff complained to Mr. Rick Komyanek about what he perceived to be discriminatory and preferential treatment towards, non South Americans, he was told that Mr. Komyanek will always support his managers regardless of how Plaintiff felt.

94.   After Plaintiff complained of discrimination, he received an unjustified performance review, and within a short period thereafter he was terminated.

95.   Plaintiff was terminated on January 14, 2005.

96.   Plaintiff, believes that Defendant Elsevier violated his rights under §1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1982) ("Section 1981"), when it discriminated against him on account of his Race/Ethnicity, by having Plaintiff train the less experienced non-Colombian candidates, and favoring the same.

97.   Plaintiff's termination by Defendant was on account of his Race/Ethnicity, and retaliation for engaging in protected activity, in violation of Uribe's rights under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981.

98.   In intentionally taking the above-described action, Defendant Elsevier, caused Plaintiff to suffer loss of wages, other benefits, pain and suffering, legal fees and costs.

### AS AND FOR A SECOND CAUSE OF ACTION: NYS HUMAN RIGHTS LAW EXECUTIVE LAW §§ 290 et seq. (Race, National Origin, and Age Discrimination and Retaliation By Defendant Elsevier).

99.   Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 98 of this Complaint with the same force and effect as if each were fully set forth herein.

100.   Plaintiff was born in Colombia, is of Colombian descent, born in 1944, and as such is a member of a protected class of persons under the New York State Human Rights Law Executive Law §§ 290 et seq., as it relates to Race, National Origin, and Age.

101.   Plaintiff was initially hired by Matthew Bender, a Law Publishing Company, as Entry Level Support Technician, in November 1995.

102.   Upon information and belief, Matthew Bender, which is located in New York, was a subdivision of and under the Times Mirror Umbrella, a Magazine Publishing Company.

103.   In 1996, Plaintiff was recognized as one of the best Infrastructure Technology Employees and awarded $7,500 in recognition thereof.

104.   In 1997, Plaintiff was again awarded and received a bonus of $15,000 for his exemplary work.

105.   Upon information and belief, some time in the middle of 1997, Times Mirror acquired Mosby, a Medical Publishing Company with its Headquarters located in St. Louis, Missouri.  At this time, Times Mirror had both Matthew Bender and Mosby under its umbrella.

106.   Mosby had an office site in Philadelphia, and Plaintiff was asked to analyze the systems that were utilized in the Philadelphia Office. That Office employed about 100 employees.

107.   The Philadelphia Office had three servers, a Novell 3.11 running printing and file sharing, a Novell 3.12 server running the e-mail system and a Windows NT 4.0 functioning as a router.  These servers were reporting a variety of problems where the servers were down and operations were being interrupted.

108.   One of the main reasons for these problems was that Windows and all the applications were running off the servers, and the e-mail system was poorly managed.  In effect, this caused users to have no email for days, at times.

109.   After a thorough analysis of the Philadelphia Office's technological problems, Plaintiff concluded that the only way he could fix the problems was to upgrade all the desktops to Windows 95 and to have all the applications run off the local hard drive.

110.   Upon information and belief, in 1998, Mosby was sold to Harcourt, a Publishing Company of Children's Books, and Matthew Bender was sold to Elsevier, a Science Publishing Company.

111.   Upon information and belief, as a result of Harcourt's acquisition of Mosby, the majority of Mosby's employees were laid off, but Plaintiff was invited to remain with the company.

112.   Amongst other duties, Plaintiff maintained computers for the Mosby employees that remained. Plaintiff did this for almost one year.

113.   Plaintiff also helped Bradley Mitchell, the Infrastructure Technology Manager of WB Saunders, acquaint himself with the Company's Systems during the merger transition.

114.   Upon information and belief, Harcourt owned WB Saunders, a Publishing Company, which was also in Philadelphia.

115.   Upon information and belief, as a result of Hartcourt's purchase of Mosby, Mosby was absorbed by WB Saunders.

116.   After a few months, WB Saunders moved one of their Departments, namely, the Clinics Department to the Mosby building.

117.   Bradley Mitchell realized Plaintiff's dedication and skills and asked him to join his Infrastructure Technology Group. Mr. Mitchell increased Plaintiff's salary by 16% after he had sent Plaintiff to Lotus Notes Training.  Plaintiff also completed a Microsoft Certified Systems Engineer in Microsoft Windows NT 4.0 Program.

118. Under Mr. Mitchell's management, Plaintiff became the Lotus Notes Administrator, the main back up of the Philadelphia Infrastructure Technology Department and the Server Administrator.

119. Sometime in May 2001, Harcourt was sold to Elsevier Science. Moreover, Plaintiff helped in this transition as well. Plaintiff took part in the migration of the St. Louis office and also helped the Elsevier team from England migrate all the servers and all their applications into the Elsevier Science domain "ELSCIENCE."

120. Before Elsevier purchased Hartcourt, Plaintiff was the maintainer of this site. Plaintiff stayed long hours to keep up with the daily operations.

121. Throughout his tenure with Defendant Elsevier, as well as the other aforementioned Publishing Companies, Mr. Uribe's work performance time and attendance were exemplary.

122. Michael Stech, a White Male who is in his early 30's, replaced Bradley Mitchell, and Plaintiff helped Mr. Stech settle into his position.

123. Subsequently, Mr. Stech hired Michael Fenton, a 23 year old White Male, as a Technician, and Plaintiff was instructed to train Mr. Fenton. Soon after, Mr. Fenton was given all of Plaintiff's duties.

124. In early 2002, Mr. Daniel Lieberman, a White Male also in his early 30's, became Plaintiff's Supervisor.

125. Soon thereafter, Mr. Lieberman started to diminish Plaintiff's roles in the Infrastructure Technology Department. Mr. Lieberman continuously insisted that Plaintiff teach other younger non South American Infrastructure Technology members everything

he knew; i.e., backups, maintenance of the servers, and the e-mail system which consisted of Lotus Notes.

126. However, when Plaintiff asked Mr. Lieberman to learn other aspects of the developing technology, Mr. Lieberman replied that Plaintiff did not need to.

127. The cross training at Plaintiff's department favored the White and significantly Younger employees, to the detriment of Mr. Uribe.

128. In March 2002, Defendant offered Plaintiff to transfer to Hoboken, New Jersey.

129. Plaintiff declined the transfer and opted to stay at his current location, in Philadelphia. However, Defendant eventually replaced Plaintiff with a White Younger employee, namely Mr. Howard Longstrech.

130. Consequently, Defendant denied Plaintiff's request to remain at the Philadelphia site, for which Mr. Uribe was especially qualified for, because they had hired Mr. Longstrech to fill Plaintiff's position.

131. In or about September 2002, Defendant forced him to transfer to Hoboken, New Jersey, against his will, where Plaintiff worked for about a year.

132. Upon information and belief, someone was fired from the New York site and Plaintiff was involuntarily transferred again to New York, as his replacement.

133. Plaintiff was forced to work at the New York site under the management of Annie Oddo, a White female, who is significantly younger than Plaintiff. Defendant's action was designed to force Plaintiff's resignation.

134. While in New York, Plaintiff was essentially demoted, and subjected to entry level duties as opposed to the duties a person of his qualifications should have. He was also supervised by younger and less qualified workers.

18

135.  In New York, although Plaintiff was to be utilized as a Senior Technical Analyst, instead, he was made to perform menial and trivial tasks.  For example, he moved boxes, stripped hard drives and performed other similar entry level and demeaning work.

136.  Plaintiff complained to Ms. Oddo about his underutilization, and the fact that he witnessed other younger non South American employees performing the duties he was lined up to do .

137.  Plaintiff's complaints were ignored.  When Plaintiff complained to Mr. Rick Komyanek about what he perceived to be discriminatory and preferential treatment towards, younger or non South Americans, he was told that Mr. Komyanek will always support his managers regardless of how Plaintiff felt.

138.  After Plaintiff complained of discrimination, he received an unjustified performance review, and within a short period thereafter he was terminated.

139.  Plaintiff was terminated on January 14, 2005.

140.  Plaintiff believes that the reasons he was terminated by Defendant Elsevier was because he is Older and of Colombian descent.

141.  In violation of the New York State Human Rights Law, Executive Law §§ 290 et seq., Defendant Elsevier by its agents, employees and/or officers discriminated against Plaintiff on the basis of his Race, National Origin and Age by having Plaintiff train the less experienced non-Colombian, significantly younger candidates, and favoring the same, and eventually firing Uribe for engaging in protected activity.

142.  In intentionally taking the above-described action, Defendant Elsevier, caused Plaintiff to suffer loss of wages, other benefits, pain and suffering, legal fees and costs.

**AS FOR A THIRD CAUSE OF ACTION:**
**NYC HUMAN RIGHTS LAW ADMINISTRATIVE CODE §§ 8-101 et seq.**
**(Race, National Origin, Age Discrimination and Retaliation By Defendant Elsevier)**

143.   Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 142 of this complaint with the same force and effect as if each was fully set forth herein.

144.   Plaintiff was born in Colombia, is of Colombian descent, born in 1944, and as such is a member of a protected class of persons under the New York City Human Rights Law as it relates to Race, National Origin, and Age.

145.   Plaintiff was initially hired by Matthew Bender, a Law Publishing Company, as Entry Level Support Technician, in November 1995.

146.   Upon information and belief, Matthew Bender, which is located in New York, was a subdivision of and under the Times Mirror Umbrella, a Magazine Publishing Company.

147.   In 1996, Plaintiff was recognized as one of the best Infrastructure Technology Employees and awarded $7,500 in recognition thereof.

148.   In 1997, Plaintiff was again awarded and received a bonus of $15,000 for his exemplary work.

149.   Upon information and belief, some time in the middle of 1997, Times Mirror acquired Mosby, a Medical Publishing Company with its Headquarters located in St. Louis, Missouri.  At this time, Times Mirror had both Matthew Bender and Mosby under its umbrella.

150.   Mosby had an office site in Philadelphia, and Plaintiff was asked to analyze the systems that were utilized in the Philadelphia Office. That Office employed about 100 employees.

151.   The Philadelphia Office had three servers, a Novell 3.11 running printing and file sharing, a Novell 3.12 server running the e-mail system and a Windows NT 4.0 functioning as a router.  These servers were reporting a variety of problems where the servers were down and operations were being interrupted.

152.   One of the main reasons for these problems was that Windows and all the applications were running off the servers, and the e-mail system was poorly managed.  In effect, this caused users to have no email for days, at times.

153.   After a thorough analysis of the Philadelphia Office's technological problems, Plaintiff concluded that the only way he could fix the problems was to upgrade all the desktops to Windows 95 and to have all the applications run off the local hard drive.

154.   Upon information and belief, in 1998, Mosby was sold to Harcourt, a Publishing Company of Children's Books, and Matthew Bender was sold to Elsevier, a Science Publishing Company.

155.   Upon information and belief, as a result of Harcourt's acquisition of Mosby, the majority of Mosby's employees were laid off, but Plaintiff was invited to remain with the company.

156.   Amongst other duties, Plaintiff maintained computers for the Mosby employees that remained. Plaintiff did this for almost one year.

157.   Plaintiff also helped Bradley Mitchell, the Infrastructure Technology Manager of WB Saunders, acquaint himself with the Company's Systems during the merger transition.

158.   Upon information and belief, Harcourt owned WB Saunders, a Publishing Company, which was also in Philadelphia.

159.   Upon information and belief, as a result of Hartcourt's purchase of Mosby, Mosby was absorbed by WB Saunders.

160.   After a few months, WB Saunders moved one of their Departments, namely, the Clinics Department to the Mosby building.

161.   Bradley Mitchell realized Plaintiff's dedication and skills and asked him to join his Infrastructure Technology Group. Mr. Mitchell increased Plaintiff's salary by 16% after he had sent Plaintiff to Lotus Notes Training.  Plaintiff also completed a Microsoft Certified Systems Engineer in Microsoft Windows NT 4.0 Program.

162. Under Mr. Mitchell's management, Plaintiff became the Lotus Notes Administrator, the main back up of the Philadelphia Infrastructure Technology Department and the Server Administrator.

163.   Sometime in May 2001, Harcourt was sold to Elsevier Science. Moreover, Plaintiff helped in this transition as well. Plaintiff took part in the migration of the St. Louis office and also helped the Elsevier team from England migrate all the servers and all their applications into the Elsevier Science domain "ELSCIENCE."

164.   Before Elsevier purchased Hartcourt, Plaintiff was the maintainer of this site. Plaintiff stayed long hours to keep up with the daily operations.

165.   Throughout his tenure with Defendant Elsevier, as well as the other aforementioned Publishing Companies, Mr. Uribe's work performance time and attendance were exemplary.

166.   Michael Stech, a White Male who is in his early 30's, replaced Bradley Mitchell, and Plaintiff helped Mr. Stech settle into his position.

167.   Subsequently, Mr. Stech hired Michael Fenton, a 23 year old White Male, as a Technician, and Plaintiff was instructed to train Mr. Fenton.   Soon after, Mr. Fenton was given all of Plaintiff's duties.

168.   In early 2002, Mr. Daniel Lieberman, a White Male also in his early 30's, became Plaintiff's Supervisor.

169.   Soon thereafter, Mr. Lieberman started to diminish Plaintiff's roles in the Infrastructure Technology Department. Mr. Lieberman continuously insisted that Plaintiff teach other younger non South American Infrastructure Technology members everything he knew; i.e., backups, maintenance of the servers, and the e-mail system which consisted of Lotus Notes.

170.   However, when Plaintiff asked Mr. Lieberman to learn other aspects of the developing technology, Mr. Lieberman replied that Plaintiff did not need to.

171.   The cross training at Plaintiff's department favored the White and significantly Younger employees, to the detriment of Mr. Uribe.

172.   In March 2002, Defendant offered Plaintiff to transfer to Hoboken, New Jersey.

173.   Plaintiff declined the transfer and opted to stay at his current location, in Philadelphia.   However, Defendant eventually replaced Plaintiff with a White Younger employee, namely Mr. Howard Longstrech.

174.  Consequently, Defendant denied Plaintiff's request to remain at the Philadelphia site, for which Mr. Uribe was especially qualified for, because they had hired Mr. Longstrech to fill Plaintiff's position.

175.  In or about September 2002, Defendant forced him to transfer to Hoboken, New Jersey, against his will, where Plaintiff worked for about a year.

176.  Upon information and belief, someone was fired from the New York site and Plaintiff was involuntarily transferred again to New York, as his replacement.

177.  Plaintiff was forced to work at the New York site under the management of Annie Oddo, a White female, who is significantly younger than Plaintiff.  Defendant's action was designed to force Plaintiff's resignation.

178.  While in New York, Plaintiff was essentially demoted, and subjected to entry level duties as opposed to the duties a person of his qualifications should have.  He was also supervised by younger and less qualified workers.

179.  In New York, although Plaintiff was to be utilized as a Senior Technical Analyst, instead, he was made to perform menial and trivial tasks.  For example, he moved boxes, stripped hard drives and performed other similar entry level and demeaning work.

180.  Plaintiff complained to Ms. Oddo about his underutilization, and the fact that he witnessed other younger non South American employees performing the duties he was lined up to do .

181.  Plaintiff's complaints were ignored.  When Plaintiff complained to Mr. Rick Komyanek about what he perceived to be discriminatory and preferential treatment

towards, younger or non South Americans, he was told that Mr. Komyanek will always support his managers regardless of how Plaintiff felt.

182. After Plaintiff complained of discrimination, he received an unjustified performance review, and within a short period thereafter he was terminated.

183. Plaintiff was terminated on January 14, 2005.

184. Plaintiff believes that the reasons he was terminated by Defendant Elsevier was because he is Older and of Colombian descent.

185. In violation of New York City Human Rights Law, Administrative Code §§ 8-101 et seq., Defendant Elsevier by its agents, employees and/or officers discriminated and retaliated against Plaintiff on the basis of his Race, National Origin and Age by having Plaintiff train the less experienced non-Colombian, significantly younger candidates, and favoring the same, and terminating his employment after he complained of discrimination.

186. In intentionally taking the above-described action, Defendant Elsevier, caused Plaintiff to suffer loss of wages, other benefits, pain and suffering, legal fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, **LUIS URIBE,** respectfully demands judgment and prays that this Court order:

(a) A declaratory judgment that Defendant, Elsevier Science, through it agents, servants, or employees, discriminated on the basis of Plaintiff's Race/Ethnicity, in the terms, conditions, and privileges of employment, in violation of 42 U.S.C. § 1981; as well as Race/National Origin and Age under the New York State Human Rights Law

Section 296 <u>et seq</u>.; and the New York City Human Rights Law, Administrative "Code Section 8-101 <u>et seq</u>., respectively.  Moreover, Defendant retaliated against him due to his race for engaging in protected activities in violation of 42 U.S.C. § 1981; the Human Rights Law § 290 et seq., and the New York City Administrative Code §8-101 et seq.;

(b)   Injunctive relief permanently restraining and enjoining Defendant from making employment decisions on the basis of the Race/Ethnicity, National Origin and/or Age of its employees or for Engaging in Protected Activity against its employees and monitoring this Defendant's employment practices;

(c)   To award Plaintiff back pay, and benefits Plaintiff has lost as a result of Defendant's unlawful discrimination against him, together with all interest on said amounts. Moreover, Plaintiff is seeking reinstatement or front pay;

(d) Requiring Defendant to pay all compensatory damages for pain and suffering as well as punitive damages, which Plaintiff is entitled to under the respective Federal, State and City Anti Discrimination Laws;

(e)   Requiring Defendant to pay Plaintiff all reimbursable expenses;

(f) Requiring Defendant to pay under 42 U.S.C. § 1981, the New York City Code and all other applicable statutes, reasonable attorney's fees and costs of this action; and

(g)   Such other and further relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury in this action.

Dated:  New York, New York
           July 18, 2005

Respectfully submitted,
Law Offices of Lee Nuwesra

**By:** _____

Lee Nuwesra (LN 5851)
Attorney for Plaintiff
60 East 42nd Street, Suite 838
New York, New York 10017
(212)  682-0655

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.